THE INTIMATE BOOKSHOP, INC., Plaintiff,

v.

BARNES & NOBLE, INC., Barnesand-noble.com Inc., Borders Group, Inc., Borders, Inc., and Walden Acquisition Company, Defendants.

No. 98 Civ.5564WHP.

United States District Court, S.D. New York.

Feb. 15, 2000.

Carl E. Person, New York, NY, for Plaintiff.

Reginald D. Steer, Pilsbury Madison & Sutro, LLP, San Francisco, CA, Brian R. Socolow, Loeb & Loeb, LLP, New York, NY, for Defendants Borders Group, Inc., Borders, Inc. and Walden Book Co., Inc.

John M. Conlon, Mayer Brown & Platt, New York, NY, for Defendant Amazon.com, Inc.

Margot J. Metzger, Robinson Silverman & Berman, LLP, New York, NY, Martin S. Hyman, Golenbock, Eiseman, Assor & Bell, New York, NY, for Defendants Barnes & Noble, Inc. and Barnesandnoble.com, Inc.

*MEMORANDUM AND ORDER*

PAULEY, District Judge.

Plaintiffs The Intimate Bookshop Inc. ("Intimate") and Wallace Kuralt ("Kuralt") filed this action on August 5, 1998 alleging violations of federal antitrust law and state law against numerous defendant retail bookstores and publishers. Thereafter, Kuralt withdrew all of his claims, and Intimate voluntarily dismissed its claims against a number of defendants. Intimate also withdrew all of its state claims and some of its federal antitrust claims. Intimate's remaining claims are for violations of Sections 2(c) and 2(f) of the Robinson–Patman Act, 15 U.S.C. §§ 13(c) and (f), against defendants Barnes & Noble, Inc.; Barnesandnoble.com, Inc.; Borders Group, Inc.; Borders, Inc.; and Walden Acquisition Company (collectively the "retailer defendants"). The retailer defendants move to dismiss Intimate's claims in part pursuant to Fed.R.Civ.P. 12(b)(6) and to require Intimate to provide a more definite statement of its other claims pursuant to Fed. R.Civ.P. 12(e). For the reasons set forth below, the retailer defendants' motion is granted in part and denied in part.

*Background*

For purposes of this motion, the following allegations in Intimate's amended complaint are assumed to be true. Intimate is a corporation which sells non-academic trade and mass-paperback books through a chain of approximately thirteen independent retail bookstores located in North Carolina, Georgia, and Washington, D.C. (Am.Compl.¶ 8) The retailer defendants are retail bookstores which compete with Intimate and other independent retail booksellers. (Am.Compl.¶¶ 16, 19, 25)

Intimate alleges that the retailer defendants are purchasing books from publishers at a unit price per book substantially lower than the price paid by Intimate and other independent retail bookstores. (Am. Compl.¶ 45) While the retailer defendants receive a 60% to 65% discount from publishers, Intimate and other independent booksellers allegedly receive only a 41% to 46% discount. (Am.Compl.¶¶ 47, 48) According to the amended complaint, the retailer defendants have also received secret discounts, rebates and deductions from publishers that were not offered to or made known to Intimate and other independent retail booksellers, including volume discounts in excess of published schedules, services such as ship dropping, deductions from and renegotiations of unpaid invoices, advertising allowances, promotional payments, and brokerage fees. (Am.Compl.¶ 50) Intimate contends that the retailer defendants have received these favorable pricing arrangements through coercion, intimidation and threats to the publishers and have directed the publishers not to disclose the details of the arrangements to independent retail booksellers. (Am.Compl.¶ 50A, 62F)

Intimate also alleges that the retailer defendants have financed themselves using unfair means. According to the amended complaint, the retailer defendants have reached their current state of financing and growth by setting their initial pricing schemes below cost. (Am.Compl.¶¶ 62C, 62D) The retailer defendants have allegedly published materially false earning reports grossly inflating their earnings in order to raise capital for further, unnecessary expansion. (Am.Compl.¶¶ 62J, 62K)

Intimate asserts that because of this price discrimination by the publishers, Intimate and other independent booksellers have lost substantial business and profits. Intimate's annual sales have decreased from $11,500,000 in fiscal 1995 to $500,000 in fiscal 1998. (Am.Compl.¶ 9) Intimate has lost 96% of its sales to the retailer defendants. (Am.Compl.¶ 62L) More than 50% of all independent retail booksellers have gone out of business during the past four years due to price discrimination in the industry. (Am.Compl.¶ 54)

Intimate also alleges that the activities of the retailer defendants have had adverse effects on the book industry. The amended complaint lists divers of adverse effects on consumers, independent retail

booksellers, distributors and wholesalers, publishers, authors and agents, and the national economy. (Am.Compl.¶ 59) For example, Intimate alleges that the retailer defendants' actions have led to increased prices for books, a reduction in quantity and variety of books, the loss of publishers and authors, and diminished competition in all aspects of the book industry. Intimate concludes that such price discrimination will have the effect of creating a monopoly in the book industry. (Am.Compl.¶ 65)

### Discussion

### I. Standard for Motion to Dismiss

In deciding a motion to dismiss for failure to state a claim under Fed.R.Civ.P. 12(b)(6), the Court's function is merely to assess the legal sufficiency of the complaint rather than to weigh the evidence that might be presented at a trial. *See Festa v. Local 3 Int'l Broth. of Elec. Workers*, 905 F.2d 35, 37 (2d Cir.1990). In resolving a motion to dismiss, the pleadings and affidavits must be construed in favor of the plaintiff, and all doubts should be resolved in the plaintiff's favor and against the defendants. *See Scheuer v. Rhodes*, 416 U.S. 232, 237, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Walker v. City of New York*, 974 F.2d 293, 298 (2d Cir.1992), *cert. denied*, 507 U.S. 961, 113 S.Ct. 1387, 122 L.Ed.2d 762 (1993). A complaint may not be dismissed under Fed.R.Civ.P. 12(b)(6) unless it "appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Black Radio Network, Inc. v. NYNEX Corp.*, 44 F.Supp.2d 565, 572 (S.D.N.Y.1999) (*quoting Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). The issue before the Court on a motion to dismiss is not whether plaintiffs will ultimately prevail but whether plaintiffs are entitled to offer evidence in support of their claims. *See Black Radio Network*, 44 F.Supp.2d at 572.

### II. Standard for Motion for More Definite Statement

Antitrust allegations, such as those asserted in this action, are governed by the notice pleading requirements set forth in Fed.R.Civ.P. 8(a). *See American Booksellers Assoc., Inc. v. Houghton Mifflin Co.*, No. 94 Civ. 8566(JFK), 1995 WL 92270, at *5 (S.D.N.Y. March 3, 1995) (citing *Broadcast Music, Inc. v. Hearst/ABC Viacom Entertainment Servs.*, 746 F.Supp. 320 (S.D.N.Y.1990)). Thus, Intimate's complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a). However, a party may make a motion for more definite statement "if a pleading to which a responsive pleading is permitted is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading...." Fed. R.Civ.P. 12(e).

### III. The Robinson–Patman Act

The purpose of the Robinson–Patman Act is "to afford antitrust protection to small and independent businesses from unfair competition by chain stores." *American Booksellers Assoc.*, 1995 WL 92270, at *1. Congress passed the Act because it believed that small independent stores were at a serious competitive disadvantage based on their relative lack of the purchasing power needed to obtain price concessions from suppliers. *See Federal Trade Comm'n v. Simplicity Pattern Co.*, 360 U.S. 55, 69, 79 S.Ct. 1005, 3 L.Ed.2d 1079 (1959); *Federal Trade Comm'n v. Morton Salt Co.*, 334 U.S. 37, 49, 68 S.Ct. 822, 92 L.Ed. 1196 (1948). The Robinson–Patman Act was designed "to level the playing field and ensure that success in the market was based on business acumen and skill rather than on discriminatory breaks derived from the belief that bigger was necessarily better." *H.L. Hayden Co. of New York v. Siemens Med. Sys., Inc.*, 672 F.Supp. 724, 743 (S.D.N.Y.1987).

### IV. Section 2(f) Claims

#### A. Motion to Dismiss

Intimate alleges that the retailer defendants have violated Section 2(f) of the Robinson–Patman Act. Section 2(f) makes

it unlawful for purchasers, such as the retailer defendants, "knowingly to induce or receive a discrimination in price which is prohibited by this section." 15 U.S.C. § 13(f). Liability under Section 2(f) is derivative in nature—a buyer may be held liable under Section 2(f) only if his seller could be held liable under Section 2(a). *See Great Atl. & Pac. Tea Co. v. Federal Trade Comm'n,* 440 U.S. 69, 77–78, 99 S.Ct. 925, 59 L.Ed.2d 153 (1979). Thus, in determining whether Intimate has pled facts sufficient to establish Section 2(f) claims against the retailer defendants, this Court must determine whether those facts support Section 2(a) claims against their sellers.

 Section 2(a) provides in relevant part:

> It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade and quality ..., and where the effect of such discrimination may be substantially to lessen competition or to tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them....

15 U.S.C. § 13(a). In order to establish a prima facie case of secondary-line discrimination[1] under Section 2(a), Intimate has the burden of establishing that: (1) the seller's sales were made in interstate commerce; (2) the seller discriminated in price as between the purchasers; (3) the product or commodity sold to the competing purchasers was of the same grade and quality; and (4) the price discrimination

had a prohibited effect on competition. *See George Haug Co. v. Rolls Royce Motor Cars Inc.,* 148 F.3d 136, 141 (2d Cir.1998) (citing *Texaco Inc. v. Hasbrouck,* 496 U.S. 543, 556, 110 S.Ct. 2535, 110 L.Ed.2d 492 (1990)).

The retailer defendants argue that this Court should dismiss Intimate's Section 2(f) claims to the extent that they are based on promotional payments and advertising allowances. The retailer defendants also assert that claims based on promotional payments and advertising allowances are only actionable under Sections 2(d) and (e), which do not give rise to a private right of action or to buyer liability under Section 2(f). *See Federal Trade Comm'n v. Fred Meyer, Inc.,* 390 U.S. 341, 350–51, 88 S.Ct. 904, 19 L.Ed.2d 1222 (1968). However, Intimate contends that the retailer defendants are receiving advertising allowances and promotional payments in excess of the costs for legitimate advertising and promotional purposes. Intimate argues that these excess amounts are really reductions in the original sale price.

 Turning to the sections in question, it is well established that Section 2(a) prohibits both direct and indirect price discrimination. *See* 15 U.S.C. § 13(a). Direct price discrimination occurs when a seller charges different prices to different purchasers for commodities of like grade and quality. *See Rickles v. Frances Denney Corp.,* 508 F.Supp. 4, 6 (D.Mass.1980) (citing *Purdy Mobile Homes Inc. v. Champion Home Builders Co.,* 594 F.2d 1313 (9th Cir.1979)). Direct price discrimination can also result from the offering of direct discounts and allowances on the commodity. *See Rickles,* 508 F.Supp. at 6. Indirect

---

1. There are three categories of price discrimination. Primary-line price discrimination occurs when a seller's price discrimination harms competition with his direct competitors. Secondary-line price discrimination occurs when a seller's price discrimination impacts competition among the seller's purchasers, i.e., there are favored and disfavored purchasers. Tertiary-line price discrimination occurs when a seller's price discrimination harms competition between customers of the favored and disfavored purchasers, even though the favored and disfavored purchaser do not compete directly against one another. *See George Haug Co. v. Rolls Royce Motor Cars Inc.,* 148 F.3d 136, 141 n. 2 (2d Cir.1998) (citations omitted).

price discrimination results when "one buyer receives something of value which is not offered to other buyers." *Rickles*, 508 F.Supp. at 6. Examples of indirect price discrimination include discriminatory freight and delivery arrangements. *See Federal Trade Comm'n v. Cement Inst.*, 333 U.S. 683, 732–33, 68 S.Ct. 793, 92 L.Ed. 1010 (1948) (discriminatory freight and delivery charges are indirect price discrimination); *Federal Trade Comm'n v. A.E. Staley Mfg. Co.*, 324 U.S. 746, 750, 65 S.Ct. 971, 89 L.Ed. 1338 (1945) (same); *Corn Prod. Refining Co. v. Federal Trade Comm'n*, 324 U.S. 726, 65 S.Ct. 961, 89 L.Ed. 1320 (1945) (same).

■ Sections 2(d) and (e) prohibit discrimination by a seller relating to the resale of goods by a purchaser. Section 2(d) prohibits a seller from paying its customer for "any services or facilities furnished by or through such customer in connection with the processing, handling, sale, or offering for sale of any products or commodities manufactured, sold or offered for sale" by the seller, unless such reimbursement is available to all competing customers on a proportionally equal basis. 15 U.S.C. § 13(d). Section 2(e) forbids sellers from discriminating in favor of one purchaser over another in the furnishing of "services or facilities connected with the processing, handling, sale or offering for sale" of the commodity purchased from the seller. 15 U.S.C. § 13(e).

■ This Court rejects the retailer defendants' argument that since discriminatory promotional allowances are covered by Sections 2(d) and (e), they cannot form the basis for a Section 2(a) violation. "Since section 2(a) by its very terms applies to both direct and indirect forms of discrimination, to the extent that the provision of or payment for services or facilities can be construed as indirect price discrimination, its proscription overlaps with those provided by sections 2(d) and 2(e)." *O'Connell v. Citrus Bowl, Inc.*, 99 F.R.D. 117, 120–21 (E.D.N.Y.1983); *see also* Irwin J. Schiffres, *Validity, Construction, and Application of §§ 2(d) and 2(e) of the Rob-*

*inson–Patman Act*, 24 A.L.R. Fed. 9 (Supp.1999) ("It has been suggested that the prohibition of price discrimination under § 2(a) is applicable in all cases in which § 2(d), and probably § 2(e), apply, because marketing allowances and services can be regarded as indirect discrimination in price. . . .") The Federal Trade Commission Guides and Trade Practice Rules specifically envision situations that violate both Sections 2(d) or 2(e) and 2(a). *See* 16 C.F.R. § 240.9 (1984) ("Allowances that have no relationship to cost or approximate cost of the service provided by the retailer may be considered to be in violation of section 2(d) or subject to the prohibitions of section 2(a). . . ."). Thus, it is clear that the resale provisions of Sections 2(d) and (e) overlap with the indirect discrimination provisions of 2(a) and (f); Intimate has alleged the type of discrimination that falls within this overlap. Accordingly, the retailer defendants' motion to dismiss Intimate's Section 2(f) claims to the extent they are based on promotional payments and advertising allowances is denied.

### B. *Motion for a More Definite Statement*

The retailer defendants argue that to the extent the Section 2(f) claims remain, Intimate should provide a more definite statement. Specifically, the retailer defendants argue that Intimate must identify the discriminating sellers and provide more factual allegations regarding the competitive injury.

■ The retailer defendants' motion for a more definite statement regarding the identity of the discriminating sellers is granted. Intimate's complaint alleges antitrust violations based upon price discrimination by "distributors" and "publishers." The complaint broadly defines "distributors" as "book wholesalers or distributors Ingram Book Company, Baker & Taylor, Inc., and other book wholesalers or distributors located in the United States (excluding the Retailer Defendants)." (Am. Compl.¶ 45F) The complaint also broadly

defines "publishers" as "all book publishers in the United States, including HarperCollins,[2] selling books to any Distributors, Retailer Defendants, [Intimate] or other Independent Retail Booksellers." (Am. Compl.¶ 45L) The complaint does not specifically list the names of distributors or publishers who allegedly sold books to Intimate and the retailer defendants at different prices. This Court agrees with the retailer defendants that allegations against *every* publisher and distributor in the United States make it impossible for them to answer the complaint. Accordingly, Intimate is ordered to amend its complaint to identify the specific discriminating sellers.

The retailer defendants' motion for a more definite statement regarding the competitive injury is denied. Intimate's complaint alleges that it is engaged in actual competition with the retailer defendants. (Am.Compl.¶¶ 16, 19, 25) Intimate advances a number of theories of competitive injury, including loss of sales by Intimate, elimination of existing independent retail bookstores, payment of higher retail prices for books by consumers and loss of publishers and independent distributors. (Am.Compl.¶¶ 9, 59)

▮▮▮▮ In secondary-line price discrimination cases, such as this action, competitive injury may be inferred from evidence demonstrating injury to an individual competitor. *See George Haug Co.,* 148 F.3d at 142 (citing *Morton Salt Co.,* 334 U.S. at 49, 68 S.Ct. 822). "Morton Salt permits an inference of injury to competition from evidence of substantial price difference over time, because such a price difference may harm the competitive opportunities of purchasers, and thus create a 'reasonable possibility' that competition itself may be harmed." *George Haug Co.,* 148 F.3d at 142. Intimate has likewise pled sufficient facts to support an inference of competitive injury, and those facts are specific enough to allow the retailer defendants to answer the complaint. Inti-

mate alleges that it lost approximately $11 million in annual sales between fiscal 1995 and 1998 due to the discriminatory pricing. (Am.Compl.¶ 9) Intimate contends that it has lost 96% of its sales to the retailer defendants as of the time of the amended complaint. (Am.Compl.¶ 62L) Intimate also claims that due to the discriminatory pricing, more than 50% of all independent retail booksellers have gone out of businesses.

Accordingly, the retailer defendants' motion for a more definitive statement is granted regarding the identity of the discriminatory sellers and is denied regarding the competitive injury.

## V. *Section 2(c) Claims*

Intimate alleges that the retailer defendants have violated Section 2(c) of the Robinson–Patman Act. Section 2(c) provides:

> It shall be unlawful for any person engaged in commerce, in the course of such commerce, to pay or grant, or to receive or accept, anything of value as a commission, brokerage, or other compensation, or any allowance or discount in lieu thereof, except for services rendered in connection with the sale or purchase of goods . . . .

15 U.S.C. § 13(c). Section 2(c) was enacted to deal with abuses of the brokerage function. *See Federal Trade Comm'n v. Henry Broch & Co.,* 363 U.S. 166, 170, 80 S.Ct. 1158, 4 L.Ed.2d 1124 (1960). These brokerage abuses include buyers obtaining indirect price concessions by setting up "dummy brokers" who are paid a commission by the seller and turn it over to the buyer; buyers obtaining price reductions equivalent to brokers' commissions when buying directly from the seller; and buyers bribing sellers' brokers. *See Henry Broch & Co.,* 363 U.S. at 169–70, 80 S.Ct. 1158.

---

2. HarperCollins was dismissed as a defendant in this action subsequent to the submission of

Intimate's amended complaint.

■ Intimate argues that the retailer defendants violated Section 2(c) in two ways. First, Intimate alleges that the retailer defendants receive "secret Discounts, Rebates and Deductions" including "brokerage fees." (Am.Compl.¶ 50(1)) Second, Intimate alleges that the retailer defendants "receive payments from publishers for advertising and sales promotion which are in excess of the amount actually spent by defendants, and to such extent such excess payments constitute unlawful payments received by defendants in violation of § 2(c) of the Robinson–Patman Act." (Pl.'s Mem. In Opp'n to Defs.' Mots. at 10)

■ As to Intimate's first basis of Section 2(c) liability—secret discounts, rebates and deductions through brokerage fees—Intimate has not pled enough facts to survive a motion to dismiss. Bald conclusory allegations that fail to give notice of the basic events and circumstances about which plaintiff complains are "meaningless as a practical matter and, as a matter of law, insufficient to state a claim." *Duncan v. AT & T Communications, Inc.,* 668 F.Supp. 232 (S.D.N.Y.1987) (citing *Barr v. Abrams,* 810 F.2d 358, 363 (2d Cir.1987)). In this case, Intimate has merely alleged that brokerage fees were one of fourteen ways that the retailer defendants received secret discounts, rebates and deductions. Beyond this mere statement, Intimate has not alleged a single specific fact regarding a brokerage arrangement, nor does the amended complaint allude to any of the specific ways in which a reduced or eliminated brokerage fee can violate Section 2(c). *See, e.g., Henry Broch & Co.,* 363 U.S. at 174–77, 80 S.Ct. 1158 (a seller may violate Section 2(c) when he makes sales though brokers, but at different prices to different sellers); *Robinson v. Stanley Home Prod., Inc.,* 272 F.2d 601, 603 (1st Cir.1959) (a seller may violate Section 2(c) when he ceases to deal through brokers and gives an equivalent discount to his buyers in lieu of the brokerage); *Wales Home Remodeling Co. Inc. v. Alside Aluminum Corp.,* 443 F.Supp. 908, 913 (E.D.Wis.1978) (a seller may violate Sec-

tion 2(c) when he makes sales to some or all direct buying customers at a lower price than those paid by customers who buy through brokers). Accordingly, Intimate's Section 2(c) claims are dismissed without prejudice to the extent they are based on secret discounts, rebates and deductions through brokerage fees.

As to Intimate's Section 2(c) claims based on payments for advertising and promotional services that were not provided, they are dismissed with prejudice. Intimate attempts to manipulate the language of Section 2(c) to cover claims outside of the brokerage context. Although "precision of expression is not an outstanding characteristic of the Robinson–Patman Act," *Automatic Canteen Co. of Am. v. Federal Trade Comm'n,* 346 U.S. 61, 65, 73 S.Ct. 1017 (1953), the case law and legislative history of Section 2(c) make it clear that Section 2(c) was not intended to apply outside of the brokerage context.

The fact that a direct payment or indirect discount passes from one party to another party does not compel the conclusion that the payment or discount violates Section 2(c). *See Henry Broch & Co.,* 363 U.S. at 175, 80 S.Ct. 1158. In order to make out a prima facie Section 2(c) claim, a plaintiff must specifically plead that the payment or discount is in lieu of a brokerage, which the Federal Trade Commission and courts have defined as a reduced or eliminated brokerage. *See* 1 Julian O. von Kalinowski, et al., *Antitrust Laws and Trade Regulation: Desk Edition* § 5.09 (2d Ed.1981 & Supp.1999) (citing cases); Herbert Hovenkamp, *Antitrust Law* Vol. XIV ¶ 2362 (1999) ("[T]he payment must be one for brokerage or in lieu of brokerage.").

Courts have routinely dismissed claims under Section 2(c) when the plaintiff has not alleged that a discount or payment is in lieu of a brokerage or commission. *See, e.g., Lupia v. Stella D'Oro Biscuit Co., Inc.,* 586 F.2d 1163, 1170 (7th Cir.1978), *cert. denied,* 440 U.S. 982, 99 S.Ct. 1791, 60

L.Ed.2d 242 (1979) (dismissing a Section 2(c) claim because "nowhere has plaintiff shown how these discounts are brokerage discounts in lieu thereof"); *Robinson,* 272 F.2d at 603–604 (affirming dismissal of Section 2(c) claim where the complaint alleged in a conclusory fashion that the reduction in price was a discount in lieu of brokerage because "[t]he matter covered by section 2(c) is unearned brokerage, per se, not discrimination"); *Zeller Corp. v. Federal–Mogul Corp.,* No. 3:95 CV 7501, 1996 WL 903951, at *3–4 (N.D.Ohio July 25, 1996) (dismissing plaintiff's Section 2(c) claims because the allegations "fail to reveal the existence of a brokerage situation or a fiduciary relationship"). Moreover, courts have dismissed claims based on advertising allowances or promotional payments when no brokerage or fiduciary relationship is alleged. *See, e.g., Labrador, Inc. v. Iams Co.,* No. CV 94–4463, 1995 WL 714454, at *4–5 (C.D.Cal. Sept. 18, 1995) (dismissing a Section 2(c) claim based on advertising allowances because "a Section 2(c) claim must relate to payments that constitute a brokerage transaction").

Intimate argues that "[t]he supporting cases are numerous" for its theory that the alleged payments for non-rendered services can be considered discounts in violation of Section 2(c). However, each case that Intimate relies on holds that such payments may violate Section 2(a), not Section 2(c). *See, e.g., Texaco, Inc.,* 496 U.S. at 562, 110 S.Ct. 2535 ("discounts violated Section 2(a) because they did not constitute reasonable reimbursement for the value of actual marketing services"); *FLM Collision Parts, Inc. v. Ford Motor Co.,* 543 F.2d 1019, 1027 (2d Cir.1976) (a manufacturer's allowance or incentive discount can violate Section 2(a)). As this Court has already discussed, Intimate's Section 2(a) claims based on discounts through advertising and promotional allowances have not been dismissed. *See, supra,* Section IV. A.

Finally, Intimate's reliance on the burden-shifting framework of *Federal Trade Comm'n v. Washington Fish & Oyster Co.,* 282 F.2d 595 (9th Cir.1960), is misplaced.

Intimate asserts that because it has alleged that the retailer defendants received allowances and discounts, the burden is on the retailer defendants to show that those allowances or discounts were given in lieu of services rendered in connection with sales or purchases. However, Intimate's argument fails because without alleging that the allowance or discount is in effect a commission or brokerage, the payment does not fall within the prohibitions of Section 2(c).

Accordingly, Intimate's Section 2(c) claims are dismissed without prejudice to the extent they are based on alleged discounts through brokerage fees and are dismissed with prejudice to the extent they are based on excess payments for advertising and promotional services never performed.

### Conclusion

For the reasons set forth above, the retailer defendants' motion to dismiss and motion for more definite statement is granted in part and denied in part. Specifically, the retailer defendants' motion to dismiss Intimate's Section 2(f) claims to extent they are based upon promotional payments and advertising allowances is denied. The retailer defendants' motion to dismiss Intimate's Section 2(c) claims to the extent they are based on brokerage fees is granted, and those claims are dismissed without prejudice. The retailer defendants' motion to dismiss Intimate's Section 2(c) claims to the extent they are based on promotional payments and advertising allowances is granted, and those claims are dismissed with prejudice. The retailer defendants' motion for a more definite statement is granted with respect to identifying the discriminatory sellers and is denied with respect to specifying the competitive injury.

Intimate is directed to serve a second amended complaint consistent with this Court's rulings by March 14, 2000. The parties are directed to appear for a pre-

trial conference on April 14, 2000 at 12:30 p.m. in Courtroom 618.