**GEORGE HAUG CO., Inc.**
Plaintiff–Appellant,

v.

**ROLLS ROYCE MOTOR CARS
INC., Defendant–Appellee.**

Docket No. 97–9238.

United States Court of Appeals,
Second Circuit.

Argued May 27, 1998.

Decided June 24, 1998.

138

Morley and Trager (Leslie Trager, of Counsel), for Plaintiff-Appellant.

Davis Webber & Edwards, P.C. (C. Dennis H. Tracey III, of Counsel), for Defendant-Appellee.

Before: CALABRESI, Circuit Judge, POLLACK* and DRONEY**, District Judges***.

POLLACK, Senior District Judge.

From 1967 until November 10, 1995, plaintiff ("Haug") was an authorized parts and service dealer of Rolls Royce automobiles in New York County. The defendant, Rolls Royce Motorcars, Inc. ("Rolls Royce") is an importer and wholesaler of Rolls Royce automobiles and parts and is the distributor thereof. Rolls Royce controlled the market for parts with respect to its automobiles known as the "after market parts". This action was commenced on August 16, 1996. The amended complaint alleged that at the instigation of a competitor of plaintiff, namely Carriage House, Rolls Royce conspired and agreed to drive plaintiff out of the business of repairing and servicing Rolls Royce automobiles as an authorized service center, to restrain trade and monopolize trade for parts and services, and to discriminate against plaintiff so as to prevent plaintiff from competing effectively. The amended complaint asserts that Rolls Royce officials were paid commercial bribes to do so. In furtherance of the conspiracy, the amended complaint further asserts that preferences were given by Rolls Royce to Carriage House consisting of more favorable credit and price terms to Carriage House with respect to parts; payment of the rent of Carriage House; allowing Carriage House a price differential and allowing Carriage House a more favorable basis for reimbursements for warranty work; and also enabling Carriage House to offer customers free work paid for by Rolls Royce while requiring Haug to charge similarly situated customers. The amended complaint alleges that during the four years prior to termination, the plaintiff was injured to a substantial monetary degree.

None of the allegations of the amended complaint were disputed by defendant. No depositions were taken, no discovery was had, and no supporting affidavits were filed by defendant; the motions were decided solely on the allegations of the amended complaint and the notice of the claims appearing from the pleading.

The District Court ruled that the amended complaint was insufficient as a claim for violation of the Sherman Act on the grounds that it did not allege "antitrust injury." Further, the District Court rejected Haug's attempt to assert Sherman Act claims on behalf of Rolls Royce dealerships due to lack of standing because Haug did not deal in new cars.

* The Honorable Milton Pollack, District Judge of the United States District Court for the Southern District of New York, sitting by designation.

** The Honorable Christopher F. Droney, District Judge of the United States District Court for the District of Connecticut, sitting by designation.

*** Pursuant to 28 U.S.C. § 46(b) and an order of the chief judge of this Court certifying a judicial emergency, this case was heard by an emergency panel consisting of one judge from this court and two judges of the United States District Court sitting by designation.

As to the Robinson–Patman claim, the District Court found that Haug failed to invoke any of the prohibitions contained in the statute therein. The District Court ruled that the amended complaint's allegation that Haug was harmed by price differentials given to Carriage House was insufficient in law as basis under Section 2(a) for a Robinson–Patman claim in the absence of some allegation of a threat thereby to competition as a whole. Haug's claim under Section 2(d) and (e) of the Act were dismissed for failure to plead that Haug is "functionally equivalent" to Carriage House. Supplemental jurisdiction over the additional State law claims was declined in the absence of a federal claim.

### DISCUSSION

We first address Haug's argument that the District Court improperly dismissed its Sherman Act claims. We hold that the District Court properly dismissed these claims because the amended complaint does not sufficiently allege "antitrust injury." Next, we address Haug's contention that the District Court erred in dismissing its Robinson–Patman Act claim. We hold that the amended complaint adequately asserts causes of action under Sections 2(a) and 2(d) of the Robinson–Patman Act.

### A. *Standard of Review*

■ This Court reviews *de novo* the District Court's decision to dismiss Haug's amended complaint under Fed.R.Civ.P. 12(b)(6). *Electronics Communications Corp. v. Toshiba America Consumer Products, Inc.*, 129 F.3d 240, 242 (2d Cir.1997). Dismissal of a complaint should not be upheld "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). "When a federal court reviews the sufficiency of a complaint, before the reception of any evidence ..., its task is necessarily a limited one. The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974). In anti-trust cases in particular, the Supreme Court has stated that "dismissals prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly." *Hospital Building Co. v. Trustees of Rex Hosp.*, 425 U.S. 738, 746, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976). Nonetheless, "[i]t is not ... proper to assume that the [plaintiff] can prove facts that it has not alleged or that the defendants have violated the antitrust laws in ways that have not been alleged." *Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 526, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983).

### B. *Sherman Act*

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States...." 15 U.S.C. § 1. Section 2 of the Sherman Act provides that "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any person or persons, to monopolize any part of the trade or commerce among the several States ... shall be deemed guilty of a felony." 15 U.S.C. § 2.

■ A private plaintiff seeking to state a claim for violation of sections 1 or 2 of the Sherman Act must allege that it has suffered "antitrust injury." *See Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 344, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990); *G.K.A. Beverage Corp. v. Honickman*, 55 F.3d 762, 766 (2d Cir.1995). The antitrust injury requirement obligates a plaintiff to demonstrate, as a threshold matter, "that the challenged action has had an *actual* adverse effect on competition as a whole in the relevant market; to prove it has been harmed as an individual competitor will not suffice." *Capital Imaging v. Mohawk Valley Med. Assoc.*, 996 F.2d 537, 543 (2d Cir.1993). "The antitrust laws ... were enacted for 'the protection of competition, not competitors.'" *Brunswick Corp. v. Pueblo Bowl–O–Mat, Inc.*, 429 U.S. 477, 488, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 320, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962).)

■ Haug's amended complaint alleges that "[Haug] and Carriage House accounted for 80% of all repairs of Rolls Royce automobiles when both were in existence in New York County, New York." Haug further alleges that as a result of its *de facto* termination, "competition [was] eliminated for the repair and servicing of Rolls Royce automobiles for 80% of the market in New York City."

■ The District Court concluded that the amended complaint did not sufficiently allege "antitrust injury":

Plaintiff has failed to plead its own market share [for the repair and servicing of Rolls Royce automobiles in New York County] or the market share purportedly absorbed by Carriage House as a result of plaintiff's "*de facto* termination." ... Thus, plaintiff has alleged no facts from which I could conclude that plaintiff's elimination from the marketplace resulted in a decrease of Roll Royce service outlets.[1]

■ In addition, the amended complaint asserts antitrust injury on behalf of authorized Rolls Royce dealerships. Specifically, Haug alleges that its elimination as a service outlet makes it less likely that consumers who are current or prospective owners of Rolls Royce automobiles living in New York County will purchase a Rolls Royce automobile from a dealer other than the Carriage House. Haug bases this allegation on the premise that these customers "would believe that they would have to go to Carriage House for warranty work and would probably not receive good treatment if they bought their Rolls Royce automobiles from a dealer other than Carriage House." Haug does not contend that it was a Rolls Royce dealership at any time during its existence. We agree

with the District Court's determination that under applicable Supreme Court precedent, Haug does not have standing to assert any antitrust injury suffered by Rolls Royce dealerships. *See Associated General Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 539, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983) (dismissing claim of a plaintiff because plaintiff "was neither a consumer nor a competitor in the market in which trade was restrained").

In short, plaintiff had failed to satisfy the pleading requirements for a claim under the Sherman Act, and these claims were properly dismissed.

### C. Robinson–Patman Act

■ It is hornbook law as cited hereinafter that anti-competitive injury need not be alleged to sustain a claim for violation of the Robinson–Patman Act; a price differential, direct or indirect, between secondary-line competitors is enough. The Act requires that each purchaser be given an "equal opportunity" by the seller to receive the benefit of higher or lower prices.

The amended complaint includes allegations which invoke three of the five basic prohibitions contained in the Robinson–Patman Act. Each of these prohibitions are discussed separately below.

#### 1. Section 2(a)

Section 2(a) of the Robinson–Patman Act provides, in pertinent part, as follows:

It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade

---

1. Note, we need not at this time advert to the District Court's discussion of exclusive distributorships in which the court found that "[e]xclusive distributorships are perfectly legal under the Sherman Act." *George Haug Co., Inc. v. Rolls Royce Motorcars, Inc.*, No. 96 Civ. 3140, 1997 WL 563806 at *3 (S.D.N.Y. Sept. 10, 1997). Exclusive distributorships are not per se authorized under the Sherman Act. Instead, we have heretofore held that an exclusive distributorship agreement, standing alone, is not illegal. *See Electronics Communications Corp. v. Toshiba America Consumer Products, Inc.*, 129 F.3d 240, 245 (2d Cir.1997); *Oreck Corp. v. Whirlpool Corp.*, 579 F.2d 126, 133 (2d Cir.1978). In order to succeed, a plaintiff must demonstrate that the exclusive distributorship had an "actual adverse effect on competition market-wide...." *Electronics Communications Corp.* at 244. That is, the focus remains on market effect. Haug has not alleged the existence of an exclusive distributorship, and we are not assured that had it done so, it would not have alleged that the exclusive distributorship resulted in antitrust injury.

and quality ... where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them....

15 U.S.C. § 13(a).

■ ▇ In order to establish secondary-line price discrimination[2] under section 2(a), a plaintiff has the burden of establishing four facts: (1) that seller's sales were made in interstate commerce; (2) that the seller discriminated in price as between the two purchasers; (3) that the product or commodity sold to the competing purchasers was of the same grade and quality; and (4) that the price discrimination had a prohibited effect on competition. *See Texaco, Inc. v. Hasbrouck,* 496 U.S. 543, 556, 110 S.Ct. 2535, 110 L.Ed.2d 492 (1990). A private plaintiff who has proved a violation of section 2(a) must, in order to recover damages under § 4 of the Clayton Act, demonstrate that it suffered actual injury to its business or property as a result of the price discrimination. *J. Truett Payne, Co. v. Chrysler Motors Corp.,* 451 U.S. 557, 562, 101 S.Ct. 1923, 68 L.Ed.2d 442 (1981). Moreover, section 2(a) affords defendants two defenses based on certain cost justifications and/or changing conditions, respectively. *See* 15 U.S.C. § 13(a).

Haug alleges that Rolls Royce discriminated against it "by in effect selling parts for Rolls Royce automobiles at a lower price to Carriage House"; and "by giving Carriage House more favorable credit terms on parts than given to plaintiff." The competitive injury alleged was that "[t]he discrimination in price and services made plaintiff unable to compete in that it allowed Carriage House to offer customers items and benefits which plaintiff could not afford. As a result, [Haug] has been injured by such discrimination in the amount of approximately $13,844,-911." The District Court determined that these allegations do not adequately assert that the alleged price discrimination had an effect on competition.

▇ The language in Section 2(a) relating to injury to competition is the key to the legality of most differential pricing practices and has engendered significant legal uncertainty as courts have struggled to determine what degree and type of market consequences will constitute the proscribed statutory effect on competition in various commercial situations. We note initially that as a prerequisite to establishing competitive injury in a secondary line price discrimination case, a plaintiff must prove that "it was engaged in actual competition with the favored purchaser(s) as of the time of the price differential." *Best Brands Beverage, Inc. v. Falstaff Brewing Corp.,* 842 F.2d 578, 584 (2d Cir.1987). The District Court did not specifically address whether Haug's amended complaint sufficiently alleges that it was in competition with Carriage House for the purposes of Section 2(a). However, the District Court, in its discussion of Haug's claims under sections 2(d) and (e), found that Haug was not "functionally equivalent" to Carriage House because Carriage House was an authorized Rolls Royce dealership in addition to being an authorized parts and service provider.

▇ Based on the pleadings, we believe that the amended complaint sufficiently alleges that Haug and Carriage House competed in the relevant market——parts used for repairing and servicing Rolls Royce automobiles. Determining the presence or absence of functional competition between purchasers

---

**2.** Price discrimination claims generally fall into three categories. The first, primary line price discrimination, occurs when a seller's price discrimination harms competition with the seller's competitors. *See, e.g., Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.,* 509 U.S. 209, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993). The second, secondary-line price discrimination, occurs when a seller's discrimination impacts competition among the seller's customers; i.e. the favored purchasers and disfavored purchas-

ers. *See, e.g., F.T.C. v. Sun Oil Co.,* 371 U.S. 505, 83 S.Ct. 358, 9 L.Ed.2d 466 (1963). The third, tertiary-line violation, occurs when the seller's price discrimination harms competition between customers of the favored and disfavored purchasers, even though the favored and disfavored purchasers do not compete directly against another. *See, e.g., Falls City Industries, Inc. v. Vanco Beverage, Inc.,* 460 U.S. 428, 436, 103 S.Ct. 1282, 75 L.Ed.2d 174 (1983).

of a commodity is simply a factual process which focuses on whether these purchasers were directly competing for resales among the same group of customers. *See FTC v. Fred Meyer, Inc.*, 390 U.S. 341, 349, 88 S.Ct. 904, 19 L.Ed.2d 1222 (1968) (Section 2(d) "reaches only discrimination between customers competing for resales at the same functional level. . . .").

■ Moreover, even if we were to assume that the parties were not in actual competition in the relevant market, Section 2(a) does not categorically exempt price discrimination between parties competing at different functional levels. Previously, we have held that to satisfy this "competitive nexus" requirement, "it must . . . be shown that, as of the time the price differential was imposed, the favored and disfavored purchasers competed at the same functional level, i.e., all wholesalers or all retailers, and within the same geographic market." *Best Brands Beverage, Inc.*, 842 F.2d at 585. The hypothetical predicate for allowing functional discounts is that price differential "merely accords due recognition and reimbursement for actual marketing functions." *Texaco, Inc. v. Hasbrouck*, 496 U.S. 543, 562, 110 S.Ct. 2535, 110 L.Ed.2d 492 (quoting Report of the Attorney General's National Committee to Study the Antitrust Laws 208 (1955)).

However, in *Hasbrouck*, the Supreme Court rejected the proposition that section 2(a) provides a safe harbor for any and all functional discounts. 496 U.S. at 563, 110 S.Ct. 2535. While the Court acknowledged that it "generally agreed" with the notion that functional discounts are permissible under the Robinson–Patman Act, the Court found that defendant was liable under section 2(a) because the trial record demonstrated that the functional discounts were "untethered to supplier's savings or the wholesaler's costs." 496 U.S. at 562–63, 110 S.Ct. 2535. Thus, even if Haug and Carriage House did compete on different functional levels, there exists a factual question whether "functional discounts" offered to the latter were in fact legitimate functional discounts or subterfuges to avoid section 2(a)'s restrictions.

Once the existence of a competitive relationship has been established, the plaintiff must demonstrate a reasonable possibility that competition has been harmed as a result of the price differential. *Falls City Industries v. Vanco Beverage, Inc.*, 460 U.S. 428, 434–435, 103 S.Ct. 1282, 75 L.Ed.2d 174 (1983) (citing *Corn Products Refining Co. v. FTC*, 324 U.S. 726, 742, 65 S.Ct. 961, 89 L.Ed. 1320 (1945)). In *FTC v. Morton Salt Co.*, 334 U.S. 37, 49, 68 S.Ct. 822, 92 L.Ed. 1196 (1948), a secondary-line price discrimination case, the Supreme Court determined that the Robinson–Patman Act was "especially concerned with protecting small businesses" and that therefore section 2(a) "was intended to justify a finding of injury to competition by a showing of 'injury to the competitor victimized by the discrimination.' "(quoting S.Rep. No. 1502, 74th Cong., 2d Sess 4). Accordingly, the Court held that competitive injury may be inferred from evidence demonstrating injury to an individual competitor. 334 U.S. at 46–47, 68 S.Ct. 822. More specifically, *Morton Salt* permits an inference of injury to competition from evidence of a substantial price difference over time, because such a price difference may harm the competitive opportunities of purchasers, and thus create a "reasonable possibility" that competition itself may be harmed.

That competitive injury may be satisfied in this manner appears at odds with other statements made by the Supreme Court whereby the Court has indicated that interpretations of the Robinson–Patman Act should be reconciled with other antitrust laws. *See, e.g., Great Atlantic & Pacific Tea Co., Inc. v. Federal Trade Commission*, 440 U.S. 69, 80 n. 13, 99 S.Ct. 925, 59 L.Ed.2d 153 (1979) (Interpretations of the Robinson–Patman Act "should be construed consistently with broader policies of the antitrust laws."). Nevertheless, the Supreme Court has repeatedly upheld the *Morton Salt* inference. *See Hasbrouck*, 496 U.S. at 559, 110 S.Ct. 2535; *Falls City Industries*, 460 U.S. at 435–36, 103 S.Ct. 1282.

In *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 113 S.Ct. 2578, 125 L.Ed.2d 168 (1993), a primary-line price discrimination case, the Supreme Court reviewed its prior case law and addressed anew the elements of a claim un-

der Section 2(a). In so doing, the Court acknowledged that its jurisprudence indicated that price discrimination within the meaning of section 2(a) is "merely a price difference." 509 U.S. at 220, 113 S.Ct. 2578. The Court, however, emphasized that in primary-line cases the language of the provision as well as the underlying Congressional intent led to the conclusion that "[b]y its terms, the Robinson–Patman Act condemns price discrimination only to the extent that it threatens to injure competition."

■ The District Court, in dismissing Haug's complaint under Section 2(a) for failure to assert "antitrust injury", did not advert to an important legal issue which has not been squarely addressed by this Circuit; namely, in secondary-line cases, whether after *Brooke Group* the same sort of antitrust injury which is a prerequisite under the Sherman Act must be shown under section 2(a) of the Robinson–Patman Act. Three Circuits addressing this issue have already determined that the answer is "no." In *Stelwagon Mfg. Co. v. Tarmac Roofing*, 63 F.3d 1267, 1272 (3rd Cir.1995), the Third Circuit, citing *Morton Salt*, found that a claim in a secondary-line price discrimination case under the Robinson–Patman Act is supportable upon proof of a substantial price discrimination between competitors over time; no reference was made to *Brooke Group*.

In another secondary-line case, *Coastal Fuels of Puerto Rico, Inc. v. Caribbean Petroleum Corp.*, 79 F.3d 182 (1st Cir.1996), the First Circuit directly took on the question of whether *Brooke Group* overruled *Morton Salt*. The First Circuit concluded that *Morton Salt* remained good law for three reasons:

First, the statutory structure that prohibits primary-line price discrimination "stands on an entirely different footing" than the statutory scheme that proscribes secondary-line discrimination. Congress first forbade primary-line price discrimination with the Clayton Act of 1914, which originally condemned discrimination that might "substantially ... lessen competition or tend to create a monopoly in any line of commerce." The statute was intended to prevent large corporations from invading markets of small firms and charging predatory prices for the purpose of destroying market wide competition, and thus specifically applied only to primary-line injury.

By contrast, secondary-line discrimination is forbidden by the Robinson–Patman Act, 49 Stat. 1526 (1936), 15 U.S.C. §§ 13–13b, 21a (1988), which amended the original Clayton Act's price discrimination proscriptions. Congress clearly intended the Robinson–Patman Act's provision to apply only to secondary-line cases, not to primary-line cases. In contrast to the Sherman Act and the Clayton Act, which were intended to proscribe only conduct that threatens consumer welfare, the Robinson–Patman Act's framers "intended to punish perceived economic evils not necessarily threatening to consumer welfare per se." In particular, the Robinson–Patman Act's amendments to the Clayton Act stemmed from dissatisfaction with the original Clayton Act's inability to prevent large retail chains from obtaining volume discounts from big suppliers, at the disadvantage of small retailers who competed with the chains.

Second, we are persuaded by the reasoning of the Ninth Circuit's opinion in [*Rebel Oil Co. v. Atlantic Richfield Co.*, 51 F.3d 1421 (9th Cir.1995)] that the amendment to the Clayton Act effected by the Robinson–Patman Act supports the continued vitality of the *Morton Salt* rule, even in the face of *Brooke Group*'s alteration of standards for primary-line price discrimination. While the Clayton Act only proscribed conduct that may "substantially lessen competition or tend to create a monopoly[,]" the new law added the following passage: "or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them." The purpose of this passage was to relieve secondary-line plaintiffs—small retailers who are disfavored by discriminating suppliers—from having to prove harm to competition market wide, allowing them instead to impose liability simply by proving effects on individual competitors. Such legislative intent directly supports

maintaining the *Morton Salt* rule, which puts into practice Congress' concern with placing the same burden on secondary-line plaintiffs that other antitrust plaintiffs face. Thus, the comparison that the Supreme Court drew between primary-line price discrimination and predatory pricing in *Brooke Group* stands on a different, and stronger, footing than any comparison that could be made between secondary-line price discrimination and other area of antitrust law, including, but not only, predatory pricing.

Third, and finally, the holding of the *Brooke Group* opinion on its face applies only to primary-line cases, not secondary-line cases. As a result, given the legislative history and statutory language distinctions, we will not presume, without more guidance, that the Supreme Court intended in *Brooke Group* to alter the well-established rule that it adopted in *Morton Salt.*

79 F.3d at 192–193 (citations omitted).

Most recently, in *Chroma Lighting v. GTE Products Corp.,* 111 F.3d 653, 658 (9th Cir. 1997), the Ninth Circuit expressly adopted the First Circuit's conclusion that the *Morton Salt* inference is applicable in secondary-line price discrimination cases even after *Brooke Group.* We now adopt the First Circuit's view in *Coastal Fuels of Puerto Rico, Inc.,* thereon.

 The appropriate question before this Court, therefore, is whether Haug's amended complaint can be read to allege a substantial and sustained price differential in the distribution of parts from Rolls Royce in order permit discovery in this matter. We find that the allegations in Haug's amended complaint sufficiently state claims under section 2(a) of the Robinson–Patman Act. Although Haug does not detail the amount and degree of the price discrimination, it does allege that it was injured "during the 4 years prior to its termination," which is adequate to withstand Fed.R.Civ.P. 12(b)(6) dismissal. *See, e.g., J.F. Feeser, Inc. v. Serv–A–Portion, Inc.,* 909 F.2d 1524, 1539 (3d Cir.1990) ("The four-year period analyzed ... establishes the requisite duration of price discrimination to support an inference of competitive injury.").

*2. Sections (d) and (e)*

Sections 2(d) and (e) of the Robinson–Patman Act provide as follows:

(d) It shall be unlawful for any person engaged in commerce to pay or contract for the payment of anything of value to or for the benefit of a customer of such person in the course of such commerce as compensation or in consideration for any services or facilities furnished by or through such customer in connection with the processing, handling, sale, or offering for sale of any products or commodities manufactured, sold, or offered for sale by such person, unless such payment or consideration is available on proportionally equal terms to all other customers competing in the distribution of such products or commodities.

(e) It shall be unlawful for any person to discriminate in favor of one purchaser against another purchaser or purchasers of a commodity bought for resale, with or without processing, by contracting to furnish or furnishing, or by contributing to the furnishing of, any services or facilities connected with the processing, handling, sale, or offering for sale of such commodity so purchased upon terms not accorded to all purchasers on proportionally equal terms.

15 U.S.C. § 13(d) and (e).

These provisions were designed to prohibit indirect price discrimination in the form of advertising and other promotional allowances made available to purchasers on disproportionate terms. *See FTC v. Fred Meyer, Inc.,* 390 U.S. 341, 350–51, 88 S.Ct. 904, 19 L.Ed.2d 1222 (1968). Section 2(d) and Section 2(e) differ in that in the former, the purchaser supplies the services or facilities and the supplier repays the purchaser; in the latter, the seller supplies the services and facilities for use of the customer in facilitating resales. *See Exquisite Form Brassiere, Inc. v. FTC,* 301 F.2d 499, 500 (D.C.Cir.1961).

Some of the substantive elements of sections 2(d) and (e) mirror those of section 2(a). Courts have read in the "in commerce" requirement into both sections 2(d) and (e).

See *Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 881–882 (9th Cir.1982). The plaintiff must demonstrate that the goods or commodity apply only to offers to customers competing in the same geographic area, *see, e.g., Eastern Auto Distributors, Inc. v. Peugeot Motors of America, Inc.*, 795 F.2d 329, 335–336 (4th Cir.1986), and reselling at the same functional level. *Fred Meyer, Inc.*, 390 U.S. at 348–49, 88 S.Ct. 904. In addition, the plaintiff must demonstrate "actual injury." *Interstate Cigar Co., Inc. v. Sterling Drug Inc.*, 655 F.2d 29, 31 (2d Cir.1981).

Section 2(d) and (e) differ from 2(a) in that no injury to competition need be demonstrated. *See FTC v. Simplicity Pattern Co.*, 360 U.S. 55, 65, 79 S.Ct. 1005, 3 L.Ed.2d 1079 (1959). In addition, neither 2(d) or (e) "has any built-in defensive matter, as does § 2(a).... [T]he only escape Congress has provided for discriminations in services or facilities is the permission to meet competition as found in the § 2(b) proviso." 360 U.S. at 65–67, 79 S.Ct. 1005.

■ Haug's amended complaint alleged that Rolls Royce "[p]aid or caused to be paid through affiliates of [Rolls Royce] the rent for Carriage House of approximately ... $60,000 to $90,000 per month, but did not pay such costs to plaintiffs;" and "allow[ed] Carriage House to offer customers free work paid for by Rolls Royce while requiring plaintiff to charge similarly situated customers." These payments are best construed as allegations of Section 2(d). *Cf. Sun Cosmetic Shoppe v. Elizabeth Arden Sales Corp.*, 178 F.2d 150, 152–53 (2d Cir.1949) (finding that subsidizing demonstrators' salaries was covered by § 2(d), and providing demonstrators was covered by § 2[e] ).

The District Court dismissed these allegations on the grounds that Haug is not "functionally equivalent" to Carriage House. However, we believe that the amended complaint does sufficiently allege that Haug competed at the same functional level with Carriage House in the relevant market.

### CONCLUSION

The dismissal of Haug's claims under Sections 1 and 2 of the Sherman Act is affirmed.

The dismissal of Haug's claims under the Robinson–Patman Act is reversed and remanded for further proceedings and Haug's supplemental state law claims are reinstated.